IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-HC-02138-M

DENNIS SHERWOOD LEWIS,                    )
                                          )
                    Petitioner,           )
                                          )
        v.                                )        **ORDER**
                                          )
TODD ISHEE,                               )
                                          )
                    Respondent.           )


On June 26, 2023, Dennis Sherwood Lewis ("petitioner" or "Lewis"), a state inmate, filed

*pro se* a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Pet. [D.E. 1]. The action

was allowed to proceed. Order [D.E. 4]. On February 19, 2024, respondent filed an initial answer

[D.E. 12], moved to dismiss, Mot. [D.E. 13], and filed a memorandum in support [D.E. 14], and

various attached exhibits [D.E. 14–1 to 14-13]. Pursuant to Roseboro v. Garrison, 528 F.2d 309,

310 (4th Cir. 1975) (per curiam), the court notified petitioner about the motion to dismiss, the

response deadline, and the consequences of failing to respond. [D.E. 15]. On April 1, 2024,

petitioner, now represented by counsel, filed a response in opposition and a memorandum. See

[D.E. 19, 20, 21]. On September 27, 2024, the court denied respondent's motion to dismiss without

prejudice. Order [D.E. 22]. On November 27, 2024, respondent answered the petition [D.E. 24],

and filed the instant motion for summary judgment, Mot. [D.E. 25], a statement of material facts

[D.E. 26], an appendix with various exhibits [D.E. 27], and a memorandum in support [D.E. 28].

On January 30, 2025, petitioner timely filed a response in opposition [D.E. 31], and a memorandum

[D.E. 32]. On February 13, 2025, respondent filed a reply. [D.E. 33].

As discussed below, the court grants respondent's motion for summary judgment.

Relevant Background:

Petitioner's § 2254 petition challenges his August 14, 2014, first-degree murder conviction

in Jones County.  See Pet. [D.E. 1]; see also N.C. Dep't of Adult Correction, Offender Pub. Info.,

https://webapps.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=0240043&searc

hOffenderId=0240043&searchDOBRange=0&listurl=pagelistoffendersearchresults&listpage=1

(search by inmate number) (visited Sept. 19, 2025) (listing, as the offense date, Jan. 19, 2011).

On direct appeal to the North Carolina Court of Appeals ("NCCOA"), petitioner's crime

of conviction was described as follows:

> The evidence presented at trial tended to show that at 12:00 p.m. on 20 January 2011, law enforcement officers with the Maysville Police Department received a call reporting someone had been shot near 3421 on Hwy 58 (the Bell property). Maysville Chief of Police Carl Baugus responded to the call.  At the scene, Chief Baugus was approached by Gloria Carawan, who said, "He's been shot."  In the driveway lay the body of Edward Earl Bell, III (Bell), the victim of an apparent shotgun wound to the head.  Law enforcement officers secured the scene and contacted the State Bureau of Investigation (SBI).  SBI Agent Nathan Smoots responded to the call.

> Agent Smoot testified that Bell was found on his back with his legs straight out and his arms positioned next to his body.  A firearm was lying inside each arm: a Hi–Point 9mm rifle inside Bell's left arm, and a 12–gauge shotgun inside his right.  In the left chamber of the 12–gauge shotgun was a spent shotgun shell.  Searching the surrounding area, Agent Smoot observed that the driver's side window of a pickup truck in the driveway had been shattered, that blood was on the steering column and interior door, that one spent 12–gauge shell casing was on the seat, and several unspent 12–gauge shell casings were in the truck's floorboard.  Inside Bell's garage, investigators observed signs of a struggle and blood stains on the door leading into the house.

> Dr. John Leonard Almeida, a pathologist employed as a medical examiner by the State of North Carolina, conducted an autopsy on Bell's body, and at trial, testified as an expert in pathology.  Dr. Almeida determined that the victim suffered a fatal shotgun blast to his head and a non-lethal small-caliber gunshot wound to his left shoulder.  Also, the victim's hands exhibited abrasions consistent with hitting something.

> The day before Bell's body was discovered, defendant entered the Emergency Room of Onslow Memorial Hospital at 3:25 p.m. on 19 January 2011.  Defendant

2

had suffered a gunshot wound that crossed his upper abdomen and left forearm. While defendant was being prepped for surgery, defendant's wife, who had transported defendant to the hospital, was interviewed by a sergeant with the Onslow County Sheriff's Department. Defendant had told his wife that he had been shot while standing in a ditch between two residences located at 146 and 148 Forest Bluff Road, near defendant's home. At 5:30 p.m., law enforcement officers and a K–9 officer arrived at defendant's house and searched the area between 146 and 148 Forest Bluff Road, an area right across the street from defendant's cul de sac entrance. In the ditch between the two homes the grass was undisturbed, well-manicured. "[T]here were no ground disturbances, footprints, no signs of movement, nothing like that." When the officers did not find any traces of a shooting, they expanded their search along the tree line behind the Forest Bluff Road residences. In the woods, they found three shotgun shells but "they didn't appear to have been all that fresh. They weren't necessarily corroded, as if they had been there for weeks and months, but they didn't look like they had been fired and shot and dropped there that day . . . ."

The next day, 20 January 2011, defendant was interviewed at Onslow Memorial Hospital. Defendant's statement was that at 12:30 the previous afternoon, he was at home when he heard three gun shots; that he went to investigate and confronted two Hispanic men in the wood line between 146 and 148 Forest Bluff Road; and that when he was standing five feet from them, the shotgun of one of the men went off striking defendant. Defendant said he discarded his T-shirt in the ditch between 146 and 148 and ran to his house. Defendant ran through the back door of his residence and immediately went to his master bathroom; his gunshot wound was "spurting blood." Obtaining defendant's permission, law enforcement officers went to defendant's home and upon entering the residence, observed bloody clothes in a kitchen trash can and drops of blood on the floor. One sergeant said, "I was expecting to see a larger volume [of blood], but that didn't exist."

The investigation of defendant's shooting expanded and then centered on defendant as a suspect in the shooting death of Bell. A search warrant was obtained and on 21 January 2011 agents from the SBI and the Onslow County Sheriff's Department executed a formal search of defendant's house pursuant to the search warrant.

A search of defendant's kitchen trash revealed men's underwear, gray socks, towels, and plastic gloves. There were blood spots in various places in the home, and in the bathroom, "foreign matter that looked like it could be some type of flesh" was found, as well as pellets inside a towel. A search of defendant's car, a blue Ford Explorer, revealed a chemical odor and various blood spots inside, as well as gloves, Clorox wipes, and plastic bags. Meanwhile, no evidence was found along the ditch or the tree line; defendant's T-shirt was not located, nor were officers able to locate any witness who heard gunshots in the neighborhood on 19 January 2011, the day defendant was shot.

3

At trial, the physician who provided medical care to defendant in the emergency room, Dr. Edgar Gallagher, Jr., testified as an expert in the field of general surgery. He evaluated defendant and found him to have suffered a gunshot wound causing extensive injury to the abdomen wall and injury to the left forearm: "[T]he pictures I have reviewed show some tissue [damage]. A lot of it is blood clot, a lot of traumatized tissue sort of shredded . . . ." As to defendant's left arm, "there was a[sic] evulsion, which is just—it was shot away, if you will; an evulsion-type injury to the soft tissue of the forearm." From defendant's abdomen, "we did remove a lot of the pellets from the area of the injury and there was also some shot wadding."

Gloria Carawan testified that in January 2011, she had been dating Bell for four months. Gloria lived in Beulaville and, at the time of trial, had been employed with the Postal Service almost ten years. In 2005, Gloria worked for the Postal Service in Beulaville, and at that time, defendant was her boss. Gloria testified that in 2005, she and her husband were separated, and though defendant was married, she and defendant had an affair that lasted a "[c]ouple of years." The romantic relationship between Gloria and defendant ended in late 2009. Gloria transferred from the post office in Beulaville to the post office in Pollocksville, where she was working when she met Bell. Despite the fact that she was working in a new town and dating another man, defendant tried to maintain contact with Gloria. Gloria testified that in December 2010, she met Bell for lunch at his house. Defendant came to Bell's house, knocked on Bell's door, and wanted to speak to her. Gloria told defendant "that he had no business there . . . [to go back to his wife] and leave [her] alone." In January 2011, a week before Bell's death, Gloria again went to Bell's house for lunch. Gloria did not see defendant, but when she attempted to leave, something had been jammed into the lock preventing the entrance gate from opening. On 20 January 2011, after Gloria had tried unsuccessfully to reach Bell by phone the day before, she drove by Bell's house. She saw his body lying on the ground, and she called 9–1–1. Hiram Bell, the victim's older brother, testified that according to his phone records, he last spoke to his brother, the victim, on 19 January 2011 from 11:11 a.m. until 11:26 a.m.

The State also presented 404(b) evidence concerning a violent confrontation between defendant and Gloria's estranged husband [William "Dinky" Carawan]. In January 2006, while Gloria and her husband were separated and Gloria was dating defendant, an argument occurred in Gloria's driveway between the two men. The argument escalated. Accounts of the incident did not provide a clear indication of who produced a gun, but the encounter ended when defendant shot Gloria's estranged husband in the arm.

Sheriff Danny Heath, one of the State's two witnesses who observed defendant at or near Bell's property within days before Bell's body was discovered, testified that on 16 January 2011, he was traveling on Highway 58 toward Pollocksville when he observed a truck in Bell's driveway. As he drove by, he noted a man wearing a "ball cap" standing beside the truck. Sheriff Heath later identified defendant as the man standing beside the truck.

4

William Sobotor, a carpenter, testified that prior to Bell moving into the residence on Hwy 58, Sobotor had done some carpentry work on the house. Before lunch time on 19 January 2011, Sobotor was traveling south on Hwy 58, toward Pollocksville. Sobotor testified that Bell's house was on Hwy 58 "on the left after you cross the bridge, Mill Run Branch Bridge." Near the bridge on the right, Sobotor testified there was a church. Sobotor observed a dark blue Ford Explorer parked on the grass near the church, "pulled right up next to the edge of the woods," facing south. He also observed a man walking south on the right-hand side of the road toward Bell's house. While the man walked, Sobotor observed what he believed to be a gun barrel hanging down, but "[he] never saw the gun stock or anything behind him." The next day, Sobotor learned that Bell had been killed. Sobotor saw defendant's picture in the paper. He said, "I'm not going to say he murdered him. [But] I believe he's the man I saw walking."

A few days after Bell's death, defendant called Gloria's son, William Robert Carawan (Robert), who lived in the "next house over" from his mother. After defendant's romantic relationship with Gloria ended, defendant sometimes called Robert to ask about or relay messages to Gloria.

> [Defendant] said that he hadn't really been able to get in contact with my mother and that he said he had done something pretty stupid and he said, "I happened to be in Pollocksville and I'd seen her come down this road and I wanted to see, you know, to talk with her because I hadn't been able to get in contact with her, so I went down there."

Defendant did not present any direct evidence. However, evidence in the State's case showed the DNA profiles taken from items collected from defendant or his residence failed to match DNA profiles taken from Bell, and that DNA profiles taken from items collected from Bell and the scene where Bell's body was found failed to match DNA profiles taken from defendant.

Defendant was convicted by jury of first-degree murder. The trial court entered judgment in accordance with the jury verdict and sentenced defendant to life imprisonment without possibility of parole."

State v. Lewis, 246 N.C. App. 516, 785 S.E.2d 186 (2016) (Table) (unpublished), 2016 WL 1319858, at *1–4; see also id. at *2 n.1 (noting that Gloria Carawan's brother "had sold defendant a Hi–Point 9mm rifle several years before.").

Petitioner raised two issues in his March 23, 2015, counseled brief on direct appeal: 1) whether the trial court erred in denying a motion to dismiss for insufficiency of the evidence, and

5

2) whether the trial court erred in denying a motion to exclude evidence, thereby allowing the State, pursuant to North Carolina Rule of Evidence 404(b), to introduce evidence of the January 13, 2006, altercation between petitioner and Gloria's husband, William "Dinky" Carawan. See Resp't Ex. 2, Pet'r's Br. [D.E. 14-3] at 7.

On April 5, 2016, the NCCOA issued an unpublished opinion finding no error. See Lewis, 246 N.C. App. 516, 785 S.E.2d 186 (2016) (Table) (unpublished), 2016 WL 1319858, at *1–9; see also Resp't Ex. 6 [D.E. 14-7] at 2–8 (printout of the NCCOA opinion).

Petitioner then filed through counsel a notice of appeal and a petition for discretionary review ("PDR") in the North Carolina Supreme Court. See Resp't Ex. 7 [D.E. 14-8].

On August 18, 2016, the North Carolina Supreme Court issued an order allowing the State's motion to dismiss the appeal and denying the PDR. See Resp't Ex. 9 [D.E. 14-10] at 2 (printout of State v. Lewis, 369 N.C. 35, 792 S.E.2d 785 (2016)).

On November 7, 2017, petitioner filed in Jones County Superior Court a counseled Motion for Appropriate Relief ("MAR") raising four issues – that petitioner's rights were violated when trial counsel unreasonably failed to object to hearsay statements including 1) statements by William "Dinky" Carawan, the deceased ex-husband of petitioner's girlfriend, Gloria Carawan, as to a January 13, 2006, altercation with petitioner, as recounted by Capt. Jones of the Duplin County Sheriff's Office; 2) statements by witness Daryl Bell as to petitioner harassing the victim before his death; 3) statements by witness Cecil Meadow that another person said the victim was fearful of petitioner, and 4) the cumulative impact of counsel failing to object to these hearsay statements was ineffective assistance of counsel ("IAC"). See Resp't Ex. 10 [D.E. 14-11] at 31–47.

On March 24, 2022, the MAR Court denied petitioner's request for an evidentiary hearing and denied the MAR. See id. at 177–81.

6

On April 19, 2023, petitioner filed through counsel a petition for a writ of certiorari ("PWC") in the NCCOA. See Resp't Ex. 10 [D.E. 14-11] at 2–27.

On June 23, 2023, the NCCOA denied this PWC. See Resp't Ex. 12 [D.E. 14-13] at 2.

On June 26, 2023, petitioner filed *pro se* the instant federal habeas petition. Pet. [D.E. 1].

Legal Standard:

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (alteration and internal quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court cannot grant habeas relief in cases where a state court considered a claim on its merits unless 1) the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or 2) the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). A state court decision is "contrary to" Supreme

7

Court precedent if it either "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to the Supreme Court's result. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also White v. Woodall, 572 U.S. 415, 419–427 (2014).

> [Section 2254(d)] does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000) (en banc), cert. denied, 534 U.S. 830 (2001).

Federal courts apply a highly deferential standard of review under 28 U.S.C. § 2254(d) and (e). See Dunn v. Madison, 583 U.S. 10, 12 (2017) (per curiam), reh'g denied, 583 U.S. 1086 (2018); Cullen v. Pinholster, 563 U.S. 170, 181 (2011). Congress intended the standard outlined in AEDPA to be "difficult to meet." See Woodall, 572 U.S. at 419 (citation and internal quotation marks omitted). "A habeas petitioner meets this demanding standard only when he shows that the state court's decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Madison, 583 U.S. at 12 (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)). Moreover, a state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010).

Absent a valid excuse, a state prisoner must exhaust all available state-court remedies before seeking federal habeas relief. See 28 U.S.C. § 2254(b); Woodford v. Ngo, 548 U.S. 81, 92

(2006) ("In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default"); see also Rose v. Lundy, 455 U.S. 509, 522 (1982). Thus, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

To satisfy the exhaustion requirement, petitioner must "fairly present" his claims to the state court. See Picard v. Connor, 404 U.S. 270, 275 (1971); Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000). A claim is "fairly presented" if petitioner presents the "substance of his federal habeas corpus claim" to the state court, including "both the operative facts and the controlling legal principles." Pethtel v. Ballard, 617 F.3d 299, 306 (4th Cir. 2010) (quotations and citation omitted).

A North Carolina prisoner satisfies the exhaustion requirement by appealing the conviction to the NCCOA then petitioning the North Carolina Supreme Court for discretionary review, or by filing an MAR and then a PWC in the NCCOA. See N.C. Gen. Stat. §§ 7A-27, 7A-31, 15A-1415, 15A-1422. "The exhaustion requirement is not satisfied if petitioner presents new legal theories or factual claims for the first time in his federal habeas petition," Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998) (citation omitted), and petitioner has the burden of proving a claim was exhausted, Mallory v. Smith, 27 F.3d 991, 994 (4th Cir. 1994), cert. denied, 513 U.S. 1047 (1994).

The procedural default doctrine generally precludes a federal court from reviewing the merits of a claim the state court found to be procedurally barred on an "independent" and "adequate" state ground. See Martinez v. Ryan, 566 U.S. 1, 10 (2012). "A procedural default occurs when a habeas petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" Breard, 134 F.3d at 619 (citation omitted).

9

A state rule is "adequate" if it is firmly established and consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988); McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000), and "independent" if the rule does not depend upon a federal constitutional ruling, see Ake v. Oklahoma, 470 U.S. 68, 75 (1985).

> A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court. "However, the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default."

Baker, 220 F.3d at 288 (citation omitted).

To review a procedurally defaulted claim, a petitioner must show cause and prejudice resulting from the alleged federal law violation, or that failure to consider the claim will result in a fundamental miscarriage of justice. Plymail v. Mirandy, 8 F.4th 308, 316 (4th Cir. 2021). Cause means showing something external prevented him from complying with the state procedural rule Coleman v. Thompson, 501 U.S. 722, 753 (1991). Prejudice means showing he was actually prejudiced by the alleged violation of law. United States v. Frady, 456 U.S. 152, 167–68 (1982).

Section 15A-1419(a)(3) of the North Carolina General Statutes provides that an MAR shall be denied when a defendant is in an adequate position to have raised the claim on appeal but did not do so. Section 15A-1419(a)(3) is an independent and adequate state procedural bar. See Lawrence v. Branker, 517 F.3d 700, 714–15 (4th Cir. 2008); Rose v. Lee, 252 F.3d 676, 683–84 (4th Cir. 2001); Williams v. French, 146 F.3d 203, 209 (4th Cir. 1998).

A federal habeas court may not review the merits of a procedurally barred constitutional claim absent cause and prejudice or a miscarriage of justice. See Brown v. Lee, 319 F.3d 162, 169 (4th Cir. 2003).

<u>Petitioner's Grounds for Relief</u>:

Petitioner's *pro se* petition lists four grounds for relief. <u>See</u> Pet. [D.E. 1] at 5–11. As his first ground for relief, petitioner states: "Actual Innocence and Trial Counsel was ineffective and did not object when [hearsay] was entered by witnesses for the State [sic]." <u>Id.</u> at 5. In support of this ground for relief, petitioner states:

> The State never showed any evidence linking [petitioner] to the crime. Head SBI investigator testified there was no evidence or witnesses linking [petitioner] to [the] crime. The state used 404B evidence against [petitioner] involving a case that the charged [sic] were dropped and deemed to be "self defense" by D.A. Lee. Trial counsel did not object to hearsay statements. Trial counsel could not hear witnesses due to hearing loss. Trial counsel let his assistant try to tell him what was said. He let an innocent man get a life sentence.

<u>Id.</u>

The second ground for relief states, he "is entitled to an evidentiary hearing to determine whether his trial counsel committed ineffective assistance." <u>Id.</u> at 7. In support, he states:

> In 404b evidence[,] Capt. Jones of Duplin County testified that Dinky Carawan told him that Dennis Lewis shot him. The jury should have never heard Dinky's version of this fight. This statement did not meet the exception of hearsay. This was due to the contradiction of facts already utter by Capt. Jones. Dinky Carawan had died in 2009 from natural causes. The 404b was never supposed to be allowed. Also[,] the trial counsel did not object to this. He was not prepared to defend against it.

<u>Id.</u>

Petitioner's third ground for relief states: "I submit my Attachment C to present my grounds in fact. This will better represent my case [sic]." <u>Id.</u> at 8. In support, he states: "The MAR Court erred in summarily denying the MAR without an evidentiary hearing. [Petitioner's] rights were denied by not ordering this hearing to ensure a fair trial in the future [sic]." <u>Id.</u>

As his fourth ground for relief, petitioner writes, *in toto*: "Ground are explained in Attachment C [sic]." <u>Id.</u> at 10.

11

For relief, petitioner asks the court to: "Overturn Conviction due to Attorney Error. If not grant evidentiary hearing or demand new trial [sic]." Id. at 15.

Petitioner's Attachment A includes, *inter alia*, appellate counsel's certificate of settlement as to the record on appeal. See Pet. Attach. [D.E. 1-1] at 5. Attachment B entails petitioner's MAR. Id. at 8–24. Attachment C entails petitioner's PWC as to the MAR denial. Id. at 25–45.

Discussion:

The court first considers petitioner's arguments raised on direct appeal – that the trial court erred by 1) denying his motion to dismiss the case for insufficiency of the evidence, and 2) failing to suppress evidence as to the January 13, 2006, altercation between petitioner and William "Dinky" Carawan – which his first ground for relief, liberally construed, re-raises.

In his counseled memorandum in opposition to the motion for summary judgment, petitioner argues that the NCCOA opinion finding no error on direct appeal deprived petitioner of his due process rights by unreasonably applying Supreme Court precedent because no rational trier of fact could have found proof of guilt beyond a reasonable doubt. See Pet'r's Mem. [D.E. 32] at 9–10 (citing Jackson v. Virginia, 443 U.S. 307, 315 (1979); Williams v. Ozmint, 494 F.3d 478, 489 (4th Cir. 2007)). Petitioner outlines the elements of first-degree and second-degree murder in North Carolina and contends that, "the evidence was insufficient to allow a rational juror to conclude petitioner killed Earl Bell at all, much less that he did so with premeditation and deliberation." Id. at 10. Petitioner further contends the State's case relied solely on circumstantial evidence, much of which should have been found inadmissible, and argues, "the evidence taken in the light most favorable to the State showed, *at worst*, second-degree murder." Id. at 10–11.

North Carolina substantive elements of first-degree murder are: "(1) the unlawful killing, (2) of another human being, (3) with malice, and (4) with premeditation and deliberation." State

12

v. Coble, 351 N.C. 448, 449, 527 S.E.2d 45, 46 (2000) (citations omitted). The elements of second-degree murder are the same minus the premeditation and deliberation element. Id. (citations omitted); see State v. Faust, 254 N.C. 101, 106, 118 S.E.2d 769, 772 (1961) ("Premeditation means 'thought beforehand' for some length of time, however short." (citation omitted)).

North Carolina courts rely upon the following types of circumstantial evidence to establish the element of premeditation and deliberation:

> (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

State v. Guin, 2022-NCCOA-133, ¶ 18, 282 N.C. App. 160, 166, 870 S.E.2d 285, 290 (quoting State v. Olson, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992)).

"The test for sufficiency of the evidence is the same whether the evidence is direct, circumstantial or both." State v. Lynch, 327 N.C. 210, 216, 393 S.E.2d 811, 814 (1990) (quoting State v. Earnhardt, 307 N.C. 62, 68, 296 S.E.2d 649, 653 (1982)).

On appeal, the NCCOA reviewed de novo the trial court's denial of the motion to dismiss for insufficiency of the evidence, distinguished the cases upon which petitioner sought to rely, and noted the standard for which circumstantial evidence may withstand a motion to dismiss. Lewis, 246 N.C. App. 516, 785 S.E.2d 186 (2016) (Table) (unpublished), 2016 WL 1319858, at *4–7.

The NCCOA then outlined the evidence presented at trial as follows:

> Here, the State presented evidence which tended to establish that despite his marriage, defendant was romantically involved with Gloria Carawan from 2005 until 2009, and that in January 2006, defendant shot Gloria's estranged husband in a confrontation in Gloria's driveway. In December 2010, while Gloria was dating Bell, defendant continued to pursue her: on at least one occasion he followed Gloria to Bell's house, knocked on the door, and tried to talk to her, before being asked to leave the house and leave her alone. There was circumstantial evidence to infer

13

that the week before Bell's death, someone had jammed the gate when Gloria attempted to leave Bell's house. Within days of Bell's death, defendant was seen at or near Bell's house. On 16 January 2011, Sheriff Heath observed defendant standing in Bell's driveway. Around lunch time on 19 January 2011, William Sobotor observed defendant walking near Bell's home, carrying what Sobotor believed to be a gun. Sobotor also observed a dark blue Ford Explorer parked nearby. At 2:50 p.m. that day, defendant called his wife, informed her that he had been shot, and that he was at home. At 3:25 p.m., defendant entered the Emergency Room of Onslow Memorial Hospital and was treated for a close range shotgun blast to his abdomen and left forearm. Defendant was interviewed at the hospital, but law enforcement officers were unable to find evidence of defendant's assailant or evidence of an assault in the place and manner described by defendant. A search of defendant's home revealed defendant's bloody clothes, but little evidence corroborated defendant's scenario of how he suffered a shotgun wound. A dark blue Ford Explorer was observed in defendant's yard.

On 20 January 2011, Maysville Police Department law enforcement officers found Bell's body lying in his driveway with two firearms at his sides: a 12–gauge shotgun, with one spent shell in a barrel; and a Hi–Point nine millimeter rifle, the same brand and caliber rifle that Gloria's brother had sold to defendant years before. A forensic pathologist testified that Bell was killed by a shotgun blast to his head. However, Bell's shoulder wound was not from a shotgun but a smaller weapon that could have been a 9mm Hi–Point rifle.

Here, notwithstanding defendant's challenge to the lack of DNA or the chain of evidence directly linking defendant to the crime scene, evidence that defendant's vehicle, a dark blue Ford Explorer, was recently cleaned created an inference that any direct evidence that may have existed either linking defendant to the scene or evidence that defendant drove himself after having been shot perhaps by Bell, was erased by defendant.

Id. at *7.

The NCCOA found that, viewed in the light most favorable to the State, "the evidence, both direct and circumstantial, was sufficient to go to the jury and allow a jury determination that [petitioner] intentionally and unlawfully killed Bell with malice and with premeditation and deliberation." Id. Accordingly, the NCCOA concluded that the trial court did not err in denying the motion to dismiss the first-degree murder charge. Id.

After review of the transcript, Resp't App., Ex. 13 to Ex. 23, [D.E. 27-1 to 27-11], the court finds the NCCOA ruling was an objectively reasonable application of Jackson, 443 U.S. at 319

(finding, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation omitted)); id. at 324 (holding petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt"); see Williams, 494 F.3d at 489–90.

Applying the deferential standard of review under 28 U.S.C. § 2254(d)-(e), petitioner fails to show that the NCCOA's ruling – finding no error in the trial court's denial of petitioner's motion to dismiss for insufficiency of the evidence – reached a result contrary to, or unreasonably applied, clearly established federal law, or was based on an unreasonable determination of the facts, see Madison, 583 U.S. at 12; Pinholster, 563 U.S. at 181; Williams, 529 U.S. at 405. Thus, respondent is entitled to summary judgment on this claim.

The court now turns to issues regarding the trial court's admission of evidence of a January 13, 2006, altercation between petitioner and William "Dinky" Carawan under North Carolina Rule of Evidence 404(b). Petitioner argues that, due to remoteness in time and insufficient similarity to the killing of the victim, the NCCOA ruling as to this evidence was erroneous and violated due process by denying him a constitutionally fair proceeding. See Pet'r's Mem. [D.E. 32] at 14–17.

North Carolina Rule of Evidence 404(b) states, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

See N.C. Gen. Stat. § 8C-1, Rule 404(b).

Rule 404(b) is a "general rule of inclusion." State v. Beckelheimer, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012) (quoting State v. Coffey, 326 N.C. 268, 278, 389 S.E.2d 48, 54 (1990)).

Rule 404(b) "evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime," State v. White, 340 N.C. 264, 284, 457 S.E.2d 841, 852–53 (1995), but is subject to "requirements of similarity and temporal proximity," State v. Al-Bayyinah, 356 N.C. 150, 154, 567 S.E.2d 120, 123 (2002). Such similarities need not be unique but must possess "some unusual facts present in both crimes." Beckelheimer, 366 N.C. at 131, 726 S.E.2d at 159 (citation and quotation marks omitted).

On direct appeal, the NCCOA noted the three-step test for the admission of evidence under Rule 404(b). See Lewis, 246 N.C. App. 516, 785 S.E.2d 186 (2016) (Table) (unpublished), 2016 WL 1319858, at *8 ("First, is the evidence relevant for some purpose other than to show that defendant has the propensity for the type of conduct for which he is being tried? Second, is that purpose relevant to an issue material to the pending case? Third, does the probative value of the evidence substantially outweigh the danger of unfair prejudice pursuant to [North Carolina Rule of Evidence] 403?" (quoting State v. Glenn, 220 N.C. App. 23, 34, 725 S.E.2d 58, 67, writ denied, review denied, appeal dismissed, 366 N.C. 403, 734 S.E.2d 863 (2012))).

The NCCOA then construed petitioner's argument as a question of relevancy, and noted its review was *de novo*, but with deference accorded to the trial court's ruling. Id. (citation omitted). The NCCOA then outlined the relevant trial court proceedings as follows:

> At trial, a voir dire hearing was held outside of the presence of the jury to address defendant's motion *in limine* to suppress evidence regarding the 13 January 2006 confrontation between defendant and Gloria's estranged husband. During *voir dire* and later before the jury, Gloria and Captain Stanley Jones with the Duplin County Sheriff's Office were called as witnesses. Gloria testified that in January 2006, she was separated from her husband William Carawan (William) and was dating defendant, who was also married. On 13 January, William stopped by Gloria's house to drop off gun scopes for their son. Gloria had previously confided in defendant about the abusive nature of her relationship with William. When defendant arrived, William was there holding Gloria's arm. Gloria testified that there was a confrontation[,] and William became very upset and beat defendant's car with a pipe, breaking two windows. When Gloria ran inside to call for help,

16

she heard a gunshot and saw William run to a neighbor's house. He had a gunshot wound to his left arm. Captain Jones testified that he investigated the incident. At the time, William acknowledged the confrontation with defendant and stated that defendant shot him. Defendant told Captain Jones that the handgun was thrown into his car and that when he picked it up, the gun went off. Defendant's charge of assault with a deadly weapon with intent to inflict serious injury was later dismissed.

At the conclusion of the *voir dire* hearing, the trial court found that the State had produced sufficient, credible, and competent evidence of similar acts and circumstances occurring during the shooting on 13 January 2006, and the shooting of the victim on 19 January 2011 and allowed the evidence to be admitted and heard by the jury. The evidence was admitted for purposes of identity and motive pursuant to Rule 404(b).

In our *de novo* review of the relevance of the 404(b) evidence and review of the similarity of the incidents, we note the record indicates that at the time of the January 2006 shooting, Gloria and defendant were in a relationship while Gloria was estranged from, but still married to William. In 2011, Gloria was in a romantic relationship with Bell, not defendant, but defendant continued to pursue her. In both 2006 and 2011, defendant shot a man in a driveway of someone else's home, and in each case the man's relationship with Gloria was annoying to defendant. In both 2006 and 2011, there was evidence of a physical confrontation with the person shot by defendant: in 2006, when defendant confronted him, William beat defendant's car before defendant shot William; and in 2011, Bell's body exhibited abrasions on his knuckles, the window of his truck had been shattered, and there was evidence of a struggle in Bell's garage. Further, Bell died in his driveway from a single shotgun blast to his head.

Id. at *8–9.

The NCCOA found the shooting of William "Dinky" Carawan on January 13, 2006, and the fatal shooting of the victim Edward Earl Bell on January 19, 2011, were sufficiently similar as to be relevant. Id. at *9. Accordingly, the NCCOA concluded that the trial court did not err by ruling to admit evidence of the January 13, 2006, altercation pursuant to Rule 404(b). Id.

Although petitioner challenges this application of a North Carolina state evidentiary rule, "[a] state court's resolution of an evidentiary question generally does not give rise to a cognizable claim under § 2254." Fullwood v. Lee, 290 F.3d 663, 692 (4th Cir. 2002); see Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-

17

court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law" (collecting cases)); Barbe v. McBride, 521 F.3d 443, 452 (4th Cir. 2008) (stating: "in considering federal habeas corpus issues involving state evidentiary rulings, 'we do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding.' Burket v. Angelone, 208 F.3d 172, 186 (4th Cir. 2000). 'It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented.' Spencer v. Murray, 5 F.3d 758, 762 (4th Cir. 1993) (internal quotation marks omitted)").

The court has reviewed the transcript, including the portions related to the trial court's admission of Rule 404(b) evidence as to the January 13, 2006, altercation. See Resp't App., Ex. 19 [D.E. 27-7] at 217–78; id., Ex. 20 [D.E. 27-8] at 3–47. Despite petitioner's contrary arguments, applying the deferential standard of review under 28 U.S.C. § 2254(d)-(e), petitioner fails to demonstrate either that the trial court's admission of this Rule 404(b) evidence impugned the fundamental fairness of the trial or infringed on his due process rights, cf. Barbe, 521 F.3d at 452, or that the NCCOA's ruling – finding the trial court did not err in admitting Rule 404(b) evidence of the January 13, 2006, altercation – reached a result contrary to, or unreasonably applied, clearly established federal law, or was based on an unreasonable determination of the facts, see Madison, 583 U.S. at 12; Pinholster, 563 U.S. at 181; Williams, 529 U.S. at 405; Estelle, 502 at 67–68. Thus, respondent also is entitled to summary judgment on this claim.

Petitioner's first ground for relief also raises IAC of trial counsel claims. See Pet. [D.E. 1] at 5. As noted above, petitioner did not raise any IAC claims on direct appeal, see Resp't Ex. 2,

Pet'r's Br. [D.E. 14-3] at 7, but the MAR raised claims regarding purported hearsay statements by 1) William "Dinky" Carawan as to the January 13, 2006, altercation, as recounted at trial by Capt. Jones of the Duplin County Sheriff's Office, 2) Daryl Bell as to the petitioner harassing the victim before his death, and 3) Cecil Meadow as to another person's statement that the victim was fearful of petitioner. See Resp't Ex. 10 [D.E. 14-11] at 31–42. As a fourth ground for relief, the MAR asserted IAC of trial counsel for failing to object to these purported hearsay statements and the cumulative impact therefrom. Id. at 42–45.

Relying upon N.C. Gen. Stat. § 15A-1419(a)(3), the MAR Court denied the MAR, finding, *inter alia*, that: petitioner's "claims for relief stem from alleged hearsay and/or Confrontation Clause violations which are clearly set forth on the existing record"; "all three underpinning grounds of the alleged ineffective assistance of counsel are clearly set forth on the trial records"; and these grounds for relief "could have been adequately raised on his direct appeal." Id. at 181.

Petitioner argues: the MAR Court erred in finding his IAC of trial counsel claims procedurally defaulted; IAC of trial counsel claims typically are raised on collateral review in North Carolina; § 15A-1419(a)(3) is both 1) inapplicable because he was not in a position to raise IAC of trial counsel claims on direct appeal, and 2) not "adequate" because it is not consistently applied to such claims; and, to the extent that his IAC of trial counsel claims are procedurally defaulted, this default is excusable due to the IAC of appellate counsel for failing to raise these claims on direct appeal as they were "plainly stronger." See Pet'r's Mem. [D.E. 32] at 1–7.

North Carolina General Statute "§ 15A-1419(a)(3) is not a general rule that any claim not brought on direct appeal is forfeited on state collateral review. Instead, the rule requires North Carolina courts to determine whether the particular claim at issue could have been brought on direct review." McCarver, 221 F.3d at 589. In North Carolina, IAC of trial counsel claims are

resolved on direct appeal when the ineffectiveness is apparent on the face of the appellate record. See State v. Fair, 354 N.C. 131, 166–67, 557 S.E.2d 500, 524 (2001). Thus, "when the 'cold record' reveals that no further investigation would have been required to raise the claim on direct review," Lawrence, 517 F.3d at 715 (citation omitted), IAC claims not raised on direct review are deemed procedurally defaulted pursuant to § 15A-1419(a)(3), see Fowler v. Joyner, 753 F.3d 446, 463 (4th Cir. 2014) (noting, for IAC claims, "the federal habeas court will still be called upon to determine, on a case-by-case basis, whether the particular ineffective-assistance-of-trial-counsel claim identified, regardless of its merits, is nonetheless procedurally defaulted [under § 15A-1419] because it could have been and should have been raised on direct appeal"); see also Lane v. North Carolina, No. 5:19-HC-2326-FL, 2021 WL 4314720, at *5 (E.D.N.C. Sept. 22, 2021).

The trial transcript shows petitioner's counsel's failure to object to these purported hearsay statements is readily apparent from the "cold record." See Resp't App, Ex. 18 [D.E. 27-7] at 83–86 (direct testimony by Darryl Bell); id. at 90–93 (direct testimony by Cecil Meadow); id., Ex. 20 [D.E. 27-8] at 33–39 (direct testimony by Capt. Stanley Jones of Duplin County Sheriff's Office).

The record also reflects that, on February 15, 2015, petitioner's appellate counsel stipulated to the record on appeal, including the trial transcript. See Pet. Attach. A [D.E. 1-1] at 5.

Accordingly, no further investigation was required for petitioner to raise these IAC of trial counsel claims on direct appeal such that, to avoid procedural default, he was required to do so. See Fowler, 753 F.3d at 463; Lawrence, 517 F.3d at 715; Fair, 354 N.C. at 166, 557 S.E.2d at 524.

Contra petitioner's arguments, N.C. Gen. Stat. § 15A-1419(a)(3) has consistently been found to be an "adequate" state rule and "firmly established" due to regular application where, as here, the IAC claims raised in petitioner's MAR could have and should have been raised on direct appeal. See Lawrence, 517 F.3d at 715; McCarver, 221 F.3d at 589; Williams, 146 F.3d at 209.

Moreover, petitioner fails to demonstrate that the court's failure to consider the IAC claims raised in the MAR will result in a fundamental miscarriage of justice. McCarver, 221 F.3d at 588, n.3.

To the extent petitioner argues he would have been prejudiced had he raised his IAC of trial counsel claims on direct appeal, the court disagrees. If petitioner had done so, and if the NCCOA determined that his IAC claims were premature or required further investigation, the NCCOA instead would have dismissed these claims without prejudice so that he could have reasserted them in his subsequent MAR. See Lane, 2021 WL 4314720, at *5 n.2 (collecting cases).

In sum, petitioner fails to establish cause, prejudice, or a fundamental miscarriage of justice sufficient to excuse his procedural default for his IAC claims as to trial counsel's failure to object to these purported hearsay statements. See Coleman, 501 U.S. at 748; McCarver, 221 F.3d at 588.

Petitioner also argues that procedural default of his IAC claims is excusable due to the subsequent IAC of appellate counsel. Pet'r's Mem. [D.E. 32] at 5–7. Although the MAR asserted as an alternative argument that failure to raise IAC claims on direct appeal was due to IAC of appellate counsel, see Pet. Attach. B [D.E. 1-1] at 21–22, petitioner did not raise this claim in his counseled PWC, see Pet. Attach. C [D.E. 1-1] at 25–45. Thus, he failed to "fairly present" his IAC of appellate counsel claim to all appropriate state courts and this claim is unexhausted. See O'Sullivan, 526 U.S. at 845; Picard, 404 U.S. at 275; Pethtel, 617 F.3d at 306; Baker, 220 F.3d at 288. To the extent petitioner's IAC of appellate counsel claim itself now is procedurally defaulted, he fails to show either cause and prejudice, or that the court's failure to consider this claim will result in a fundamental miscarriage of justice. See Plymail, 8 F.4th at 316; Baker, 220 F.3d at 288.

In sum, the MAR Court's finding that petitioner's IAC of trial counsel claims were procedurally defaulted is presumed correct on federal habeas review, and he has failed to rebut the finding by "clear and convincing evidence." See 28 U.S.C. § 2254(e)(1); Sharpe, 593 F.3d at 378.

Applying the deferential standard of review under 28 U.S.C. § 2254(d)-(e), petitioner fails to show that the MAR Court's determinations regarding his IAC claims were based on an unreasonable determination of the facts or reached a result contrary to, or unreasonably applied, clearly established federal law, see Madison, 583 U.S. at 12; Pinholster, 563 U.S. at 181; Williams, 529 U.S. at 405. Thus, respondent is entitled to summary judgment on this claim.

Petitioner's second ground for relief, claiming IAC of trial counsel, fails for the above reasons. Further, because he does not satisfy the exceptions of 28 U.S.C. § 2254(e)(2)(A), or show further factfinding would demonstrate, "by clear and convincing evidence," that "no reasonable factfinder" would have convicted him of the crime charged, § 2254(e)(2)(B), he also has not shown entitlement to an evidentiary hearing, see Shinn v. Ramirez, 596 U.S. 366, 379–81 (2022).

Petitioner's third and fourth grounds for relief, liberally construed, essentially re-raise the claims asserted in his PWC – that he received IAC of trial counsel pursuant to failures to object to purported hearsay statements. See Resp't Ex. 10 [D.E. 14-11] at 2–27. As discussed above, however, the MAR Court found that these IAC claims were procedurally defaulted, see id. at 181, and petitioner again fails to establish cause, prejudice, or a fundamental miscarriage of justice to excuse this procedural default, see Coleman, 501 U.S. at 748; McCarver, 221 F.3d at 588.

Petitioner also baldly asserts "actual innocence." See Pet. [D.E. 1] at 5. In apparent support of this actual-innocence claim, petitioner's January 16, 2024, letter states, in relevant part:

> Today I found out the the [sic] Jones County Sheriff's Office had taken a report that the V. [sic] was alive and well at 1:30 p.m. on 1-19-11. He was spoken to in his yard. The da [sic] has tried to conject a time line of the V. [sic] being dead by 11:30 A.M. on 1-19-11. This has no basis. The deputy that took that report was a tenant of the V. [sic] and is no longer with law enforcement. This report was never disclosed. They also did not report that the V. [sic] was depositing a check in Pollocksville at 12:00 P.M. on the 1-19-11. Worse than that, they disposed of evidence or the SBI did. The SBI stated they did not get all of the evidence collected by SBI Smoots. Jones stated they turned it in. SBI Reaves stated on Record that he had seen results from the missing evidence. However[,] we never

22

got this report. My DNA was not at the scene[,] but a 3rd persons DNA was there but not sent to Codas [sic]. My Attorney Jack was the soccer coach for D.A. Lee's daughter.

[D.E. 9] at 1.

Although a showing of actual innocence may serve as a "gateway" to the review of time-barred or otherwise procedurally barred federal claims, "tenable actual-innocence gateway pleas are rare" because "'a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin v. Perkins, 569 U.S. 383, 386 (2013) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)); see Teleguz v. Pearson, 689 F.3d 322, 329 (4th Cir. 2012).

For a credible actual-innocence claim, petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324; see Bousley v. United States, 523 U.S. 614, 623 (1998) (noting, "'actual innocence' means factual innocence, not mere legal insufficiency." (citation omitted)).

Here, petitioner does not present this purported report from the Jones County Sheriff's Office indicating the victim was alive at 1:30 p.m. on January 19, 2011. Cf. [D.E. 9] at 1. The record reflects that the MAR Court allowed post-conviction discovery which petitioner received, see Resp't Ex. 10 [D.E. 14-11] at 122, 178, but he did not identify sources of evidence outside the record, or raise any such claims, in his MAR, see id. at 31–120. Even presuming this report exists, it would not inherently conflict with the timeline presented at trial. Lewis, 246 N.C. App. 516, 785 S.E.2d 186 (2016) (Table) (unpublished), 2016 WL 1319858, at *1–4, 7; see Resp't App., Ex. 17 [D.E. 27-5] at 85 (Hiram Bell's testimony he last spoke to the victim in a telephone call ending

at 11:26 a.m. on Jan.19, 2011); id. at 89 (Albert Bell's testimony he last spoke to the victim via telephone the morning of Jan. 19, 2011, circa "20 to nine"); id. at 232 (Joseph Bell's testimony he last spoke to the victim via about 9:00 a.m. on Jan. 19, 2011); id., Ex. 18 [D.E. 27-6] at 12–14 (Gloria Carawan's testimony that: on Jan. 19, 2011, after she "got off work that afternoon," she repeatedly tried to call the victim but "he never answered the phone"; on Jan. 20, 2011, she "tried to call him that morning as well," and, at lunchtime, she went to the property of the victim, "saw him on the ground" and "knew it was really bad," and "went back to the car and [ ] called 911"); id. at 156 (Special Agent Raymond Reaves' testimony that the 911 call was made around 12-12:15 p.m. on Jan. 20, 2011); id., Ex. 17 [D.E. 27-5] at 6 (Chief Carl Baugus' testimony that dispatch radioed "shots fired" and called for available Jones County units circa 12:00 p.m. on Jan. 20, 2011); id. at 37–44 (Jones County Emergency Services Director Timothy Pike's testimony that dispatch called possible gunshots "around 12:00 or 12:30 that day on January 20, 2011," he responded in an ambulance, and, when he saw the body, "it was obvious nothing could be done"); id., Ex. 15 [D.E. 27-3] at 20 (Special Agent Nathan Smoots' testimony that he received a call about a death investigation at approximately 12:40 p.m. on Jan. 20, 2011); see also id., Ex. 18 [D.E. 27-6] at 851–56 (William Sobotor's testimony that: on Jan. 19, 2011, "the day [the victim] was killed," "before lunchtime, around 11," Sobotor was driving past a church by the victim's house on Highway 58 and saw a dark blue Ford Explorer parked on the grass facing South; Sobotor saw a man "walking South on the right side of the road" with a "gun barrel hanging down"; this man "glanced over his shoulder" and looked at Sobotor for about two seconds"; and, when Sobotor later saw petitioner's picture published in relation to the crime, Sobotor believed petitioner was "the man [Sobotor] saw walking"); id., Ex. 17 [D.E. 27-5] at 99–103 (Tim Vincent's direct testimony that, as the on-call detective with the Onslow County Sheriff's Department, he received

24

a call circa 4:00 p.m. on Jan. 19, 2011, about a gunshot victim at Onslow Memorial Hospital, he responded to the hospital, spoke to petitioner, and went to petitioner's neighborhood to investigate); id. at 175–76 (Vincent's cross examination testimony that: he got the "call from the ER right around 3:50 or so"; it "makes perfect sense" that petitioner had arrived somewhere around 3:30 p.m.; and "it sounds about right" that petitioner called his wife around 2:50 p.m.); id., Ex. 19 [D.E. 27-7] at 6–8 (Dr. Edward Gallagher's testimony that, on Jan. 19, 2011, he saw petitioner for a gunshot wound to the abdomen wall and left forearm at the Emergency Department, with defense counsel stipulating to petitioner's hospital arrival circa 3:25 p.m.).

Succinctly stated, petitioner's actual-innocence claim is unsupported by "new reliable evidence," and he otherwise fails to satisfy the exacting standard for a credible actual-innocence claim. See McQuiggin, 569 U.S. at 386; Bousley, 523 U.S. at 623; Schlup, 513 U.S. at 324.

In sum, because there are no issues of material fact for trial, respondent is entitled to summary judgment on all petitioner's grounds for relief. See Anderson, 477 U.S. at 249.

Finally, because reasonable jurists would not find the court's treatment of any of these claims debatable or wrong, and because none of the issues are adequate to deserve encouragement to proceed further, the court also will deny a Certificate of Appealability. See 28 U.S.C. § 2253(c); Miller-El v. Cockrell, 537 U.S. 322, 336–38 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Conclusion:

For the reasons discussed above, the court: GRANTS the motion for summary judgment [D.E. 25]; DENIES a Certificate of Appealability; and DIRECTS the clerk to close the case.

SO ORDERED this 25th day of September, 2025.

RICHARD E. MYERS II
Chief United States District Judge